IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WILLIAM WILSON,

           Plaintiff,

v.

NORTHLAND COLLEGE and
WRM AMERICA INDEMNITY COMPANY,

           Defendants.

OPINION AND ORDER

17-cv-337-slc

Plaintiff William Wilson is the former athletic director and women's basketball coach for Northland College, a small private college in Ashland, Wisconsin. Wilson resigned in April 2014 after Northland investigated him for two separate sexual harassment complaints in the spring of 2013 and early 2014.

This lawsuit arises from a series of radio broadcasts and corresponding on-line stories run in May 2014 by Danielle Kaeding, who was the program director at Northland's college radio station. Wilson alleges that the stories, in which Kaeding interviewed Wilson's accusers and reported on the investigations, breached his Separation Agreement with Northland that restricted what Northland could say about his resignation in response to media inquiries. Wilson also has brought claims for invasion of privacy under Wis. Stat. § 995.50(2)© and negligent supervision of its employee, Kaeding. This court has jurisdiction pursuant to 18 U.S.C. § 1332.

Northland has moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. 24. I am granting this motion. Wilson cannot state a plausible claim for invasion of privacy because the matters on which Kaeding reported were public, not private facts. His breach of contract claim fails because he has failed to articulate a plausible theory of breach

that is tied to the language of the parties' agreement and the contract's plain language does not support his claim. Finally, Wilson's negligent supervision claim fails because the only duty that Northland allegedly breached was the duty to abide by the terms of the contract, which cannot provide the basis for a tort claim.

The following facts, which I accept as true for purposes of deciding the instant motion, are drawn from the Amended Complaint and documents and news broadcasts that Wilson incorporated by reference.[1]

## ALLEGATIONS OF FACT

### I. The Parties

Plaintiff William Wilson is a resident of the State of Kansas. Wilson previously was employed by defendant Northland College as its Head Women's Basketball Coach and Athletic Director. He resigned in June 2014.

Defendant Northland College is a private post-secondary college with its principal place of business located in Ashland, Wisconsin. Defendant WRM America Insurance Company is defendant's liability insurer and is located in Uniondale, New York.

### II. Plaintiff's Employment and Separation from Northland

Wilson began working for Northland in August 2009 as the Head Women's Basketball Coach and Assistant Athletic Director. In 2011, he began jointly serving as the college's

---

[1] In support of its motion to dismiss, Northland has submitted a number of documents to which Wilson refers in the Amended Complaint. Under the incorporation-by-reference doctrine, a defendant may submit a document to which the plaintiff refers in his complaint without converting a motion to dismiss into a motion for summary judgment. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Wilson has not objected to the submission of these documents.

2

Director of Athletics while continuing his role as the head women's basketball coach. In the Fall of 2013, Wilson became Northland's full-time Director of Athletics.

During Wilson's employment by Northland, the school investigated him twice in response to complaints. In the spring of 2013, Northland investigated a complaint that Wilson had created a hostile work environment by making inappropriate comments to female employees. Northland concluded that there was insufficient evidence to support a finding that Wilson had created a hostile work environment.

On February 27, 2014, Northland investigated a Title IX complaint alleging that Wilson had engaged in discriminatory treatment of female students on the women's basketball team. On or about April 8, 2014, Northland informed Wilson that, after investigating the complaint "and considering the issues which have arisen in the past about which you have full knowledge," Northland had decided that it would be Wilson's final year as Athletic Director.

On or about April 21, 2014, Wilson and Northland entered into a "Separation Agreement and Release," signed by Wilson and Northland's Director of Human Resources, Paul Skoraczewski. Dec. of Robert Jackson, dkt. 26, Exh. A. Paragraph 7 states::

> 7. <u>Explanation of Departure and Non-Disparagement.</u>
>
> Northland and Wilson agree that they will jointly issue a statement which may be in the form of a press release indicating that Wilson is leaving his employment with Northland effective June 30, 2014 to pursue other opportunities. This statement must be issued by April 25, 2014 and the parties agree that they will work cooperatively in preparing it. Wilson agrees that he will not orally or in writing disparage Northland in general or any of its officers, faculty members, staff, students, employees or members of the Board of Trustees. To the extent that either party is asked by a media source of any

sort to provide an additional explanation, both parties will state that the mutually agreed upon statement speaks for itself.

*Id*. at ¶7.

### III. Kaeding's News Stories

Northland College owns and operates a public radio station, WNRC-97.7 FM. Danielle Kaeding was the station director and an employee of defendant. On May 7, 8 and 9, 2014, Kaeding published on-air and online news stories about Wilson that discussed Northland's 2013 and 2014 investigations into Wilson's alleged misconduct. The first on-line article was titled "Northland College conducted two investigations of former athletics director." The second article was titled "Title IX investigation took place this spring." The third article was titled "Title IX investigation completed this spring." Each of the articles corresponded to a separate audio broadcast.

In these articles, Kaeding reported statements by former and current Northland students, faculty and coaching staff regarding Wilson and the 2013 and 2014 investigations. The statements in the reports are primarily those of the colleagues and students who observed and, in some cases, felt targeted by the reported conduct. The stories quoted Wilson's accusers, who spoke about Wilson's alleged conduct as a coach and athletic director, including discriminatory comments he made to the homosexual basketball players he coached as well as offensive remarks he made in front of female employees. *See* Am. Complaint, dkt. 21, ¶21 (quoting from articles); Dec. of Robert Jackson, dkt. 26, Exh. B (attaching articles in their entirety).

In all six articles, Kaeding stated that both Northland and Wilson declined to comment on either the 2013 or 2014 investigations, and no article included any comments from

Northland officials on why Wilson resigned. The articles indicated that Northland, when contacted for comment, responded that its policy is that it does not comment on personnel matters. Kaeding's third article included this discussion of Northland's response to a request for comment:

> The college announced the resignation of Wilson effective immediately at the end of April. When asked for comment about the accusations against Wilson and his resignation, the college released a prepared statement that read, "As a matter of policy, Northland college does not comment on personnel matters. The answers to any questions regarding staff and faculty policies and procedures are included in the Northland College personnel handbook. We announced Bill Wilson's resignation in a news release Friday, April 25 and have no further comment."

Wilson learned of these articles and on May 8, 2014, he emailed Skoraczewski to complain that Kaeding's reporting violated his right to privacy; Wilson also implied that Kaeding's articles violated the separation agreement. Skoraczewski replied the following day, explaining that Kaeding's stories were her work alone. The college had not assisted or approved this reporting in any way. Skoraczewski advised that Kaeding's "description of the stories was in violation of direct, written instructions provided to her by legal counsel for the College. Her instructions were to include the fact that this story was her own work and not the work of the College. The stories now reflect that requirement."

OPINION

**I. Standard of Review**

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)); *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016) (quoting *Twombly*). A complaint satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) ("[T]he complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together.").

When deciding a motion to dismiss under Rule 12(b)(6), the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Katz-Crank*, 843 F.3d at 646 (citing *Iqbal*, 556 U.S. at 662, 663); *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

**II. Violation of Right to Privacy**

In Count 1, Wilson claims that Northland violated his right to privacy under Wis. Stat. § 995.50(2)©. Through that statute, the Wisconsin Legislature created a cause of action for invasion of privacy by a private party. *Zinda v. Louisiana Pac. Corp.*, 149 Wis. 2d 913, 928-29,

440 N.W. 2d 548, 555 (1989); *Emiabata v. Marten Transp., Ltd.,* 574 F. Supp. 2d 912, 917 (W.D. Wis. 2007). Wilson relies on Sec. 995.50(2)©, which states:

> (2) In this section, "invasion of privacy" means any of the following:
>
> * * *
>
> © Publicity given to a matter concerning the private life of another, of a kind highly offensive to a reasonable person, if the defendant has acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter involved, or with actual knowledge that none existed. It is not an invasion of privacy to communicate any information available to the public as a matter of public record.

In *Zinda*, 149 Wis. 2d at 929-30, 440 N.W. 2d at 555, the Wisconsin Supreme Court teased out the elements of a claim under this statutory subsection, which it described in shorthand as "unreasonable publicity given to the private life of another." The plaintiff must prove four elements:

(1) "publicity," which means "public disclosure of facts regarding the plaintiff;"

(2) the facts disclosed were private facts;

(3) the private matter made public is "one which would be highly offensive to a reasonable person of ordinary sensibilities;" and

(4) the defendant acted unreasonably or recklessly as to whether there was a legitimate public interest in the matter, or with actual knowledge that none existed.

*Id*.

Northland argues that Wilson has failed to state a claim for invasion of privacy because the matters on which Kaeding reported were matters of public concern, not private facts. I agree. Matters which are deemed quintessentially private are those that a person "does not expose to

7

the public eye, but keeps entirely to himself or at most reveals only to his family or to close friends." Restatement (Second) of Torts § 652D, cmt. b (1977). "Sexual relations, for example, are normally entirely private matters, as are family quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a man's life in his home, and some of his past history that he would rather forget." *Id*.

Kaeding did not report about quintessentially private topics. Kaeding reported about Wilson's job performance at his workplace, more specifically job-related conduct that was directed toward and observed by numerous other people and that had led Wilson's employer to investigate whether Wilson had violated federal laws prohibiting discrimination.

As the cases cited in Northland's brief, dkt. 25, at 17-18, illustrate, the workplace is generally regarded as a public place for purposes of evaluating invasion-of-privacy claims. Wilson has not cited any contrary authorities or pointed to anything in Kaeding's articles that concerned private matters such as Wilson's family, home life or medical history. Moreover, Wilson cannot validly argue that Kaeding's reports about a Title IX investigation of an athletic director at a private college were not a matter of legitimate public interest.

Instead, Wilson seems to argue that the facts disclosed were "private" because they had not previously been disclosed, and that Kaeding, as an employee of Northland, had a legal duty not to disclose them. Wilson appears to draw support for this assertion from a document entitled "Rights of Respondent" that Northland provided him in connection with the Title IX investigation, which stated that Wilson had "the right to be informed in advance, when possible, of any public release of information" regarding the Title IX complaint.

Wilson's arguments fail to provide any plausible basis for finding that the facts disclosed in Kaeding's articles were private. The statement from the "respondent's rights" document to which Wilson cites actually undermines his argument, in that it does not prohibit the release of information about the Title IX complaint, it just gives him a qualified right to advance notice. In any case, the test for whether a matter is private turns on the nature of the facts disclosed, not whether those facts up to that point had been shaded from exposure. There is no plausible basis for a jury to find the matters reported by Kaeding were private facts as that term is used in the statute. Wilson's invasion of privacy claim must be dismissed.

### III. Breach of Contract

In Wisconsin, a breach of contract claim requires a plaintiff to show a valid contract that the defendant breached and damages flowing from that breach. *Matthews v. Wis. Energy Corp. Inc.*, 534 F.3d 547, 553 (7th Cir. 2008) (citation omitted).[2] Contracts are to be construed as written, and if the contract is unambiguous, then the court determines the parties' intent by the four corners of the contract. *Betz v. Diamond Jim's Auto Sales*, 2014 WI 66, ¶ 39, 355 Wis. 2d 301, 320, 849 N.W.2d 292, 302.

For purposes of the motion to dismiss, Northland does not dispute that Kaeding was Northland's employee or that, as such, she was bound by the terms of the contract. Nonetheless, Northland argues, Wilson's claim fails because he has failed to identify any term in the contract that Northland–*via* Kaeding–breached.

---

[2] The agreement contains a choice-of-law provision specifying that Wisconsin law applies to any disputes arising under the contract. Sep. Agreement, ¶13.

I agree. It appears that Wilson's claim rests on sentences one and four of Paragraph 7, which, when read together, state:

> Northland and Wilson agree that they will jointly issue a statement which may be in the form of a press release indicating that Wilson is leaving his employment with Northland effective June 30, 2014 to pursue other opportunities. . . . To the extent that either party is asked by a media source of any sort to provide an additional explanation, both parties will state that the mutually agreed upon statement speaks for itself.

Wilson does not claim that Northland failed to issue the required statement or that the statement included subject matter beyond the scope of the mutual agreement. Nor does he allege that, "when asked by a media source" for more information, Northland breached its obligation to state that the news release speaks for itself. As Northland points out, Kaeding reported that when asked to comment about the accusations against Wilson and his resignation, Northland released a prepared statement indicating that it had issued a press release on April 25 and that it would be making no further comment. Northland further points out that, beyond reporting that Wilson had resigned (something the parties agreed would be a public fact), Kaeding did not present herself as knowing or explaining the reason(s) *why* he resigned. Br. in Supp., dkt. 25, at 33.

In his response brief, Wilson does not dispute any of these assertions, nor does he point to any other provision in the Separation Agreement that he claims was breached by *Kaeding*. So far as it appears, Wilson's breach of contract claim is based upon his belief that the mutually-agreed upon press release was to be "Plaintiff's and Defendant Northland College's *only statement to the public*" about Wilson, Am. Comp., dkt. 21, at ¶15, and that it barred *anyone* employed by

10

Northland from speaking not just about Wilson's resignation, but about his conduct on the job, his alleged sexual harassment or the Title IX investigations.

As Northland points out, no such term appears in the contract. Northland maintains that the contract is unambiguous and that nowhere therein "did Northland agree to order and enforce an employee-wide gag order under which it would prohibit employees from discussion or reporting on statements from Northland's current or former students, coaching staff or faculty on harassment or Title-IX-related allegations against Wilson." *Id.*, at 25. It is a "basic rule of contract construction" that the court court cannot, "in the guise of construing [the] contract" insert what has been omitted or rewrite a contract made by the parties." *Levy v. Levy*, 130 Wis.2d 523, 533 (1986). Although construction of a contract is essentially one of determining the intent of the parties, *id.* at 533-34, this intent is to be determined "as evidenced by the language they saw fit to use." *Badger Pharmacal, Inc. V. Colgate-Palmolive*, 1 F.3d 621, 629 (7th Cir. 1993), quoting *State ex rel. Journal/Sentinel v. Pleva*, 155 Wis.2d 704, 711 (1990). When the terms of the contract are plain and unambiguous, then the court must construct the contract as it stands, even though the parties might have placed a different construction on it. *Id.*, citing *Algrem v. Nowlan* 37 Wis. 2d 70, 79 (1967), in turn quoting *Cernohorsky v. Northern Liquid Gas Co.,* 268 Wis. 586, 592 (1955). The court in *Cernohorsky* continues:

> It seems to us that when parties to a contract adopt a provision which does not contravene a principle of public policy, and which contains no element of ambiguity, the court has no right, by a process of interpretation to relieve one of them from any disadvantageous terms which he actually has made.

*Id.*

11

Believing it indisputable that Northland stabbed him the back, Wilson expresses incredulity that Northland would take this position. Actually, Northland's argument has more traction than Wilson appreciates, yet Wilson provides no facts, develops no arguments and cites no case law in opposition. Wilson does not dispute Northland's contention that the terms of the Separation Agreement are unambiguous. Wilson fails to point to any specific language or develop any reasoned argument in support of his claim that the Separation Agreement constructively imposed a campus-wide gag order or non-disparagement requirement that prohibited all of Northland's employee from saying anything about Wilson's work conduct or the Title IX investigations. All Wilson says is that Kaeding was Northland's employee, which in his view means that Northland had a contractual duty to prevent her from saying anything about Wilson beyond the bargained-for joint press release.

This is not enough to establish a plausible theory of relief. Although this court can hypothesize a scenario in which plaintiff's complaint might survive front-end dismissal, "it is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver." *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) (quoting *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002)); *see also Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (deeming the plaintiff's negligence claim abandoned because he failed to delineate it in his brief in opposition to summary judgment). There is no basis from which this court can draw a reasonable inference that Kaeding's investigative reports–in which she accurately reported that Northland would not comment about the reason for Wilson's resignation beyond its press release–could be viewed as

a breach by Northland of Paragraph 7 of the Separation Agreement. Accordingly, this claim will be dismissed.

## IV. Count II--Negligent Supervision

A claim for negligent supervision of an employee requires a plaintiff to plead and prove four elements: (1) the employer had a duty of care owed to the plaintiff; (2) the employer breached its duty; (3) a wrongful act or omission of an employee was a cause-in-fact of the plaintiff's injury; and (4) an act or omission of the employer was a cause-in-fact of the wrongful act of the employee. *John Doe 1 v. Archdiocese of Milwaukee*, 2007 WI 95, ¶ 16, 303 Wis. 2d 34, 50–51, 734 N.W.2d 827, 834. "'A defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone.'" *Rolph v. EBI Companies*, 159 Wis. 2d 518, 532, 464 N.W.2d 667 (1991). The duty is to refrain from such act or omission. *A.E. Investment Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 485, 214 N.W.2d 764.

It is not entirely clear from the Amended Complaint (or Wilson's brief) what duty Northland allegedly breached. Insofar as Wilson is alleging that Northland had a duty not to disclose publicly any information about the Title IX investigation, the only source of that duty that he identifies is the Separation Agreement. However, "[i]n order . . . for a cause of action in tort to exist, a duty must exist *independently of the performance of the contract.*" *Madison Newspapers, Inc. v. Pinkerton's Inc.*, 200 Wis. 2d 468, 473, 545 N.W. 2d 843, 846 (Ct. App. 1996) (emphasis in original). *See also Nelson v. Motor Tech, Inc.*, 158 Wis.2d 647, 653, 462 N.W.2d 903, 906 (Ct. App. 1990) (in order to proceed in a tort action when the parties'

relationship is defined by contract, there must be a common-law duty independent from any duties created by the contract). Wilson does not argue or cite any authorities to support his suggestion that, independent of the obligations imposed by the Separation Agreement, Northland had a duty to restrict its news personnel from running stories about faculty members accused of violating federal anti-discrimination laws.

The sole support for Wilson's negligent supervision claim appears to be the fact that Kaeding allegedly violated Northland's instruction to include with her reports a notice stating that they were her own work and not the work of Northland College. However, simply because Kaeding may have ignored this instruction is not enough, by itself, to give rise to a duty on Northland's part. Wilson does not suggest that Kaeding had a common law duty *to Wilson* to include the notice with her reports such that her failure to do so was negligent. If there was any such duty, it grew out of the Separation Agreement, and thus cannot provide the basis for a tort claim.

In his brief, Wilson emphasizes that Kaeding was an employee over whom Northland allegedly had control, but this too is insufficient to support a negligent supervision claim. "[L]iability does not result solely because of the relationship of the employer and employee, but instead because of the independent negligence of the employer." *L.L.N. v. Clauder*, 209 Wis. 2d 674 , 699 n.21, 563 N.W. 2d 434, 445 n.21 (1997). The amended complaint is devoid of any facts to support a plausible inference of independent negligence on Northland's part. Wilson alleges that a) Northland was aware Kaeding was going to do a news story about Wilson and the Title IX complaint, b) it provided her with written instructions to include a notice indicating that the story was her work alone and not that of the college, and c) Kaeding violated those

14

instructions. Wilson does *not* allege that Northland was obliged to do more or that it was foreseeable that Kaeding would ignore its instructions. Absent any allegation of action or inaction on Northland's part that led to Kaeding's alleged breach of a duty of care that she owed to Wilson, Wilson has not plausibly alleged a claim for negligent supervision.

ORDER

IT IS ORDERED THAT the Amended Complaint, dkt. 21, is DISMISSED WITH PREJUDICE. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 9th day of January, 2018.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge